**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WILLIAM FARRETTA, ) | No. CV-04-0908-PHX-SMM |
| ) | |
| Plaintiff, ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| ) | |
| v. ) | |
| ) | |
| BURR-BROWN CORPORATE ) DISABILITY INCOME PLAN; et al., ) | |
| ) | |
| Defendants. ) | |

This case involves a claim for long term disability benefits under an employer provided plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001- 1461. Mr. William Farretta ("Farretta") contends that Aetna Life Insurance Company ("Aetna") improperly terminated his permanent disability benefits. Aetna contends that Farretta was no longer permanently disabled under the applicable Plan and that it properly terminated his benefits. The Court held a one-day bench trial on January 5, 2006. Having reviewed the evidence *de novo* and listened to the arguments of counsel, the Court now enters its Findings of Fact, Conclusions of Law, and Order pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

*Procedural Background*

1. On April 30, 2004, Farretta filed a Complaint alleging the following three counts against Aetna and the two other defendants: 1) Count I: Recovery of Plan Benefits 29 U.S.C. § 1132(a)(1)(B); 2) Count II: Breach of Fiduciary Duty under 29 U.S.C.

1  § 1104, 1105 and 1131(a)(3) and 3) Attorneys' Fees and Costs pursuant to 29 U.S.C. § 1132(g)(1).

2. On January 8, 2005, Count II was dismissed pursuant to the parties stipulation at the pre-trial conference held on January 4, 2005.

3. Farretta brought suit against four different entities: Burr-Brown Corporate Disability Income Plan, Aetna, Texas Instruments Tucson Corporation and Texas Instruments Corporation. The Record, however, only contains evidence regarding the potential liability of Aetna.[1]

*Employment History and the Disability Plan*

4. In 1991, Farretta was employed as a sales manager for Burr-Brown Corporation ("Burr-Brown"). As a regional sales manager for Burr-Brown, Farretta oversaw sales of technology products in 17 different states. Farretta's job frequently required working 12-hour days and required extensive travel (approximately 100,000 miles per year) on little or no advance notice. On these trips, he was required to carry all of his data books, supplies and luggage by himself.

5. While the number of hours worked by Farretta per week is disputed by Aetna, it is undisputed that Farretta's sales manager position at Burr-Brown was a full-time position requiring at least 40 hours per week.

6. As part of his employee benefits package, Farretta received long term disability benefits. Burr-Brown purchased long term disability insurance from New York Life Insurance Company to cover this employee benefit ("Plan").

7. The Plan defines disability as follows:

"Disability" and "Disabled" mean that because of injury or sickness:

1) The insured cannot perform **each** of the material duties of **his regular occupation**; OR

---

[1] Counsel for Aetna, repeatedly stated on the Record that Aetna is the claims administrator and is the legally responsible party in this case. Farretta's Counsel, while refusing to stipulate to this obvious position, did not produce any evidence that contradicts Aetna's position.

- 2 -

|   |   |   |
|---|---|---|
| 1 |   | 2) The insured, while unable to perform all the material duties of his regular |
| 2 |   | occupation on a full time basis is: a) performing at least one of the material duties |
| 3 |   | of his regular occupation or another occupation on a full-time basis; and b) earning |
| 4 |   | currently at least 20% less per month than his indexed pre-disability earnings due |
| 5 |   | to that same injury or sickness.  (emphasis added). |
| 6 | 8. | The Plan also defines "indexed pre-disability earnings" as "your basic monthly |
| 7 |   | earnings in effect just prior to the date your disability began adjusted on the first |
| 8 |   | anniversary of benefit payments and each following anniversary.  Each adjustment |
| 9 |   | will be based on the lesser of 10% or the current annual percentage increase in the |
| 10 |   | Consumer Price Index.  The Consumer Price Index means the CPI-W as published |
| 11 |   | by the U.S. Department of Labor.  We reserve the right to use some other similar |
| 12 |   | measurement if the U.S. Department of Labor changes or stops publishing the CPI- |
| 13 |   | W." |

*Aetna's Review of Farretta's Disability Claims*

9. In 1991, Farretta was involved in an automobile accident and he filed a claim for total disability benefits under the Plan.

10. Farretta's claim was evaluated and he was found to be disabled in late 1991 due to cervical spondylosis and carpal tunnel syndrome.  As a result, Farretta began receiving the basic monthly benefit of $2,520.00 and continued to receive the benefit  until his benefits were discontinued in December, 2002.

11. On February 27, 2001, Aetna sent Farretta a letter seeking additional information in order for it to continue to evaluate his claim. Aetna asked for things such as current medical information, a rehabilitation survey and financial information.

12. On April 8, 2001, Marsha Knapp, the disability specialist evaluating the claim, requested Dr. Kelley's (Farretta's treating physician) records, including the March 23, 2001 MRI.  Aetna also requested records from Dr. Janet Mullins (another independent Doctor who treated Farretta).

- 3 -

13. On May 8, 2001, Ms. Knapp concluded that Aetna needed surveillance of Farretta to determine the level of his physical activities and to observe his daily level of physical exertion.

14. The surveillance was requested for three days and took place on May 14-16, 2001. The surveillance report and video recorded during the surveillance was later provided to Aetna for evaluation on or about May 21, 2001.

15. Based on the information developed, the claim was referred for a Site Medical Assessment on June 6, 2001, and the medical examiner, Dr. Barry Gendron, was asked to clarify the restrictions and limitations based on new medical information and surveillance. He was also asked to opine on Farretta's prognosis for improvement.

16. After reviewing the medical records and surveillance, Dr. Gendron reported his findings to Ms. Knapp in a July 5, 2001 memorandum.

17. Aetna notified Farretta by telephone and then in writing by a letter dated November 14, 2001, that he would be required to undergo an independent medical examination ("IME") conducted by Dr. Ernest R. Griffith, M.D.

18. The IME occurred on December 4, 2001, and Dr. Griffith completed his report that day.

19. Dr. Griffith believed a functional capacity examination ("FCE") would be beneficial before he could opine on Farretta's work capacity and the number of hours he was capable of working.

20. Accordingly, Ms. Knapp scheduled the FCE with Bruce Willoughby on January 29, 2002.

21. Upon receiving the IME, FCE and Dr. Griffith's comments on the FCE, Ms. Knapp then referred the matter back to Dr. Gendron for an on-site medical assessment.

22. After reviewing the IME, FCE, LMS, Farretta's medical records, the surveillance video and Dr. Kelley's comments, Aetna concluded that Farretta no longer met the

- 4 -

|   |     |   |
|---|-----|---|
| 1 |     | definition of disability defined in the Plan. An Aetna Claims Manager |
| 2 |     | summarized Aetna's evaluation of Farretta's claim in a memo dated November 27, |
| 3 |     | 2002, and recommended that the claim be terminated effective December 1, 2002. |
| 4 | 23. | The Claim Manager's recommendation was approved and on December 28, 2002, |
| 5 |     | Aetna informed Farretta in writing that his benefits were being terminated based |
| 6 |     | on its conclusions that: 1) his medical condition was not considered severe enough |
| 7 |     | to meet the definition of Total Disability, as defined in the Group Long-Term |
| 8 |     | Disability Contract and 2) that he was capable of returning to full-time work and |
| 9 |     | performing each of the material duties of his own occupation. |
| 10 | 24. | Farretta appealed this decision on March 7, 2003. |
| 11 | 25. | On June 19, 2003, Maryanne Barry, an Aetna appeals analyst, informed Farretta's |
| 12 |     | counsel that Aetna affirmed the decision to terminate benefits; Faretta then filed |
| 13 |     | suit in this Court. |

*Farretta's Medical Condition*

| 15 | 26. | In 1991, Farretta was involved in an auto accident that resulted in the following |
|---|-----|---|
| 16 |     | injuries: lumbosacral osteoarthritis, chronic cervical and lumbosacral radiculpathy, |
| 17 |     | bilateral distal median neuropathy secondary to bilateral carpal tunnel syndrome. |
| 18 | 27. | On October 10, 1991, Farretta underwent left carpal tunnel surgery and on |
| 19 |     | November 21, 1991, Farretta underwent cervical fusion and discectomy and right |
| 20 |     | carpal tunnel surgery. |
| 21 | 28. | In late 1991, Farretta's claim was evaluated and he was found to be disabled due to |
| 22 |     | cervical spondylosis and carpal tunnel syndrome. |
| 23 | 29. | In 1991, Farretta was also involved in a second automobile accident that |
| 24 |     | aggravated the his injuries in his neck and arm regions. |
| 25 | 30. | In 1996, Dr. Kelley provided the following diagnosis to one of the insurers |
| 26 |     | administering the Plan before Aetna : "This gentleman is currently working at light |
| 27 |     | duty on his part time basis. I do not feel he will significantly change in the future. |

- 5 -

|   |   |   |
|---|---|---|
| 1 |  | I do not therefore feel that he will ever be able to do 'any occupation' on a full |
| 2 |  | time basis." |
| 3 | 31. | An MRI in 1997, revealed: "There is evidence of disc degeneration at the L3-4, |
| 4 |  | L4-5, and L5-S1 levels with small tears of the outer annular fibers at L3-4 and L4- |
| 5 |  | 5." The MRI also reveals that the surgical fusion of the C5 and C6 vertebrae, |
| 6 |  | resulted in a mild reversal of the normal cervical lordosis. |
| 7 | 32. | On September 11, 1997, Farretta was involved in a third automobile accident that |
| 8 |  | aggravated his cervical and lumbar osteoarthritis. |
| 9 | 33. | In 1998, the insurer administering the Plan (prior to Aetna) stated, "Medical |
| 10 |  | appears to support perm. part-time (20 hpw/ sed-light). All indications are |
| 11 |  | improvement to [full-time] unlikely." |
| 12 | 34. | By 2001, Farretta was no longer able to take his regular pain medication because |
| 13 |  | of gastrointestinal maladies. In 2003, Farretta suffered from antral gastritis which |
| 14 |  | resulted in a recommendation that he refrain from taking "NSAID's" and "COX-2" |
| 15 |  | inhibitors including Celebrex. |
| 16 | 35. | An MRI conducted in 2003 revealed "mild flattening of the ventral aspect of the |
| 17 |  | cervical cord at this level and mild cervical canal stenosis . . . mild posterior disk |
| 18 |  | bulging at C4-5, which briefly contacts the ventral aspect of the cervical cord" |
| 19 |  | which means his vertebrae are still fused, and discs are still bulging and flattening |
| 20 |  | or at least touching his spinal cord in his neck. |
| 21 | 36. | The 1991 MRI showed only cervical spondylosis (dissolution or degeneration of |
| 22 |  | the vertebra) and foraminal stenosis (narrowing of a natural passage in the spinal |
| 23 |  | column), meaning that the MRI in 1991 did not reveal that his condition impinged |
| 24 |  | on his spinal cord, like the 2003 MRI did. |
| 25 | 37. | Farretta has a 29% AMA impairment rating which limits him to non-full time |
| 26 |  | employment at sedentary to light duty activity levels. |
| 27 | 38. | Farretta's disability currently limits his ability to sit, stand, walk, drive or perform |
| 28 |  | upper and lower extremity motion activities for extended periods. At this time, |

- 6 -

|   |     |   |
|---|-----|---|
| 1 |     | Farretta can only perform these activities for less than four hours per day or twenty |
| 2 |     | hours per week. |
| 3 | 39. | Since he began receiving benefits in 1991, Farretta has attempted to work as a |
| 4 |     | hearing office for John Ore, a justice of the peace, a tour guide and a sales |
| 5 |     | representative for Sol Healthcare.  These attempts to re-enter the workforce failed |
| 6 |     | due to the limits imposed on Farretta by his physical disabilities. |
| 7 | 40. | While the surveillance video contained some evidence that Farretta has some range |
| 8 |     | of motion on a temporary basis, the persuasive weight of the medical evidence |
| 9 |     | supports a finding that Farretta is disabled within the meaning of the Plan. |
| 10 | 41. | The Court finds Farretta is disabled within the meaning of the Plan by a |
| 11 |     | preponderance of the evidence and that Farretta as sustained his burden of proof. |

## CONCLUSIONS OF LAW

42. This Court has jurisdiction pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq.

43. The proper standard of review of the record in this matter is *de novo*.[2] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978, 981 (9th Cir. 2005) (stating that "district courts review a decision to deny or terminate benefits under an ERISA plan under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan").

44. ERISA matters subject to *de novo* review are to be resolved by a bench trial upon the administrative record. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999).

---

[2] There is no evidence in the record that the benefit plan gave the plan administrator discretion to determine eligibility and the parties stipulated to a *de novo* standard of review of the Record.

- 7 -

1  45. Farretta has the burden of proof to show that he was eligible for continued long
2      term disability benefits, based upon the terms and conditions of the ERISA Plan.
3  46. Farretta contends that Aetna must offer evidence of a significant change in
4      Farretta's condition to justify the termination of benefits.  The Ninth Circuit has not
5      addressed the issue of whether the burden of proof shifts when a plan administrator
6      decides to terminate benefits after initially finding the recipient eligible for
7      benefits.  Accordingly, in support of his contention, Farretta relies on dicta in a
8      Ninth Circuit case and a holding from the Eighth Circuit.  See Regula v. Delta
9      Family-Care Disability Survivorship Plan, 266 F.3d 1130, 1146 (9th Cir. 2001)[3]
10     (noting in dicta, that the "plan's sudden termination of Regula's benefits came
11     abruptly, with no evidence of a significant change in his condition."); McOsker v.
12     Paul Revere Life Ins., 279 F.3d 586, 589 (8th Cir. 2002) (stating that the previous
13     payment of benefits weighs against a decision to terminate benefits unless new
14     information significantly alters the initial decision).
15 47. In a slip opinion, a District Court from the Eastern District of California, recently
16     held that ERISA does not require that an administrator prove that a recipient's
17     condition has changed since it last approved a decision to reward benefits.  That
18     court further noted that the administrative record in that case was sufficient to
19     demonstrate that as of January 2004 the recipient was not totally disabled.  Refkin
20     v. New York Life Ins., 2005 WL 2086073 (E.D. Cal. August 29, 2005).  In Refkin,
21     that court cited Ellis v. Liberty Life Assuarance Co., 394 F.3d 262 (5th Cir. 2004)
22     for a more thorough discussion of this issue.  In Ellis, that court found: "We have
23     found no statutory, regulatory, or jurisprudential authority...that would heighten
24     the level of proof needed for a plan fiduciary to determine entitlement or non-
25     entitlement to LTD benefits simply because the fiduciary previously had approved

---

[3] Regula has been subsequently abrogated by the United States Supreme Court in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003) based on its endorsement of the treating physician rule.

- 8 -

|   |     |                                                                                                |
|---|-----|------------------------------------------------------------------------------------------------|
| 1 |     | entitlement and paid benefits to the employee in question." Id. at 274.  The Fifth            |
| 2 |     | Circuit also specifically held that the plan fiduciary is not required to obtain proof        |
| 3 |     | of a substantial change in a recipient's medical condition after the initial                  |
| 4 |     | determination of eligibility.  Id.                                                             |
| 5 | 48. | This Court, like the court in Refkin, is persuaded by the reasoning set forth in Ellis        |
| 6 |     | and finds that the burden of proof remains with Farretta to establish that he is              |
| 7 |     | currently disabled under the Plan.                                                             |
| 8 | 49. | Farretta is unable to perform "all of the material duties of his 'regular occupation'          |
| 9 |     | on a full-time basis."  An individual's "regular occupation" is "a position of the             |
|10 |     | same general character as the insured's previous job with similar duties and                   |
|11 |     | training requirements." Dionida v. Reliance Std. Ins. Co., 50 F.Supp.2d 934, 939              |
|12 |     | (N.D. Calif. 1994).                                                                            |
|13 | 50. | Aetna contends that the Court should adopt the DOT definition of Sales Manager,               |
|14 |     | while Farretta argues that a more closely tailored definition that encompasses more           |
|15 |     | of the specific duties his prior position at Burr-Brown should be adopted.                     |
|16 | 51. | This case does not require the Court to choose between the parties' alternative               |
|17 |     | definitions to determine whether Farretta can perform each of the material duties             |
|18 |     | of his "regular occupation."                                                                   |
|19 | 52. | The Court has found that Plaintiff is unable to sit at a desk, stand, engage in               |
|20 |     | substantial travel (either by car or airplane) or perform repetitive twisting or              |
|21 |     | bending movements of the upper torso for periods of time that exceed four hours a             |
|22 |     | day or twenty hours per week.                                                                  |
|23 | 53. | The Court has also found that Farretta's "regular occupation" required him to                 |
|24 |     | perform his material duties for at least 40 hours per week.                                    |
|25 | 54. | Under Aetna's proposed definition of "regular occupation" Farretta would be                   |
|26 |     | required to: "coordinate sales distribution by establishing sales territories, quotas,        |
|27 |     | and goals and advises dealers, distributors, and clients concerning sales and                 |
|28 |     | advertising techniques," "direct staffing, training, and performance evaluations to           |

- 9 -

|   |     |   |
|---|-----|---|
| 1 |     | develop and control sales program" and "analyze sales statistics to formulate |
| 2 |     | policy and to assist dealers in promoting sales," in addition to approximately ten |
| 3 |     | other duties. |
| 4 | 55. | Given Farretta's limited capacity for activities such as sitting at a computer or |
| 5 |     | standing at a counter for prolonged periods, the Court finds that he could not |
| 6 |     | perform many of the duties set forth in Aetna's proposed definition of "regular |
| 7 |     | occupation." |
| 8 | 56. | Accordingly, Farretta is disabled under the first definition of disability as he is |
| 9 |     | unable to perform *each* of the material duties of his "regular occupation," even |
| 10|     | where such term encompasses only the duties set forth in Aetna's proposed |
| 11|     | definition of "regular occupation." |
| 12| 57. | Farretta is also disabled under the second definition of disability even if he can |
| 13|     | perform at least one of his material duties on a part-time basis as the record |
| 14|     | establishes that Farretta's income is under the threshold set forth in the Plan. |
| 15| 58. | The Court finds that Mr. Farretta is entitled to $2,520 per month in past due |
| 16|     | benefits from January 1, 2003 to December 31, 2005 for a total of $90,720 in back |
| 17|     | benefits as of December 31, 2005. |
| 18| 59. | Farretta has requested pre-judgment interest at the Arizona statutory rate of 10%. |
| 19|     | The Ninth Circuit, however, has a "strong policy in favor of the Treasury bill rate" |
| 20|     | and "any departure from it must be accompanied by a reasoned justification." |
| 21|     | Blanton v. Anzalone, 813 F.2d 1574, 1576 (9th Cir. 1987).  See also U.S. v. |
| 22|     | Gordon, 393 F.3d 1044, 1058 n.12 (noting that "under federal law the rate of |
| 23|     | prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961.") |
| 24|     | Farretta did not provide the Court evidence justifying a departure from the |
| 25|     | Treasury Bill rate. |
| 26| 60. | The Court finds that an award of attorneys' fees to Farretta is appropriate under 29 |
| 27|     | U.S.C. § 1132(g)(1).  In exercising its discretion to award attorneys' fees under § |
| 28|     | 1132(g)(1), the Court considered the following factors: |

> (1) the degree of the opposing parties' culpability or bad faith;
> (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter other from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir. 1980).

61. The Court finds that the parties in this case litigated a closely contested issue in good faith and therefore neither party acted in bad faith and both sides presented meritorious positions. Although, the Court finds that the deterrent effect of awarding fees would not be significant, it will have some deterrent value. While the Court also finds that Farretta was not seeking to benefit all participants in the Plan and that this case does not raise a significant legal question regarding ERISA, Farretta's recovery of disability benefits owed to him under the Plan would be a hollow victory if he was not awarded fees given the tremendous costs associated with litigation of this magnitude. Aetna also has the ability to pay Farretta's legal fees. Thus, the Court awards his attorneys' fees.

62. Faretta shall make his application for fees pursuant to Local Rule of Civil Procedure 54.2 after the appeal, if any, is concluded or after the time for filing an appeal has expired and an appeal is not taken.

## CONCLUSION

Accordingly, for the reasons set forth above,

**IT IS ORDERED** that the Court finds in favor of Plaintiff William Farretta and against Defendant Aetna.

**IT IS FURTHER ORDERED** that the Court enters judgment against Defendant Aetna and in favor of Plaintiff William Farretta in the amount of $90,720 for benefits accrued from January 1, 2003 to December 31, 2005.

**IT IS FURTHER ORDERED** that Farretta is entitled to pre-judgment interest at the rate of interest paid on a 52-week Treasury Bill immediately in effect prior to the

1  termination of Farretta's benefits in December of 2002 applied to each monthly disability
2  payment not received from January 1, 2003 to December 31, 2005.
3        **IT IS FURTHER ORDERED** that Farretta's request for fees and costs under
4  Title 29 U.S.C. § 1132(g)(1) is **GRANTED**.
5        **IT IS FURTHER ORDERED** that Aetna shall re-commence payment of
6  Farretta's monthly benefits effective upon receipt of this order.
7
8        DATED this 24th day of January, 2006.

_____
Stephen M. McNamee
Chief United States District Judge

- 12 -